# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RBY&CC EAST SIDE HOMEOWNERS ASSOCIATION, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2022-0433-SEM |
| PATRICK BEEBE and TAMMY BEEBE, | ) ) ) | |
| Defendants. | ) ) | |

## MASTER'S FINAL POST-TRIAL REPORT

Final Report: June 9, 2023
Date Submitted: February 23, 2023

Seth L. Thompson, PARKOWSKI GUERKE & SWAYZE, P.A., Wilmington, Delaware; *Attorney for Plaintiff RBY&CC East Side Homeowners Association, Inc.*

Brian E. O'Neill, ELLIOTT GREENLEAF, P.C., Wilmington, Delaware; *Attorney for Defendants Patrick Beebe and Tammy Beebe.*

**MOLINA, M.**

Through this action a homeowners association seeks to enforce the deed restrictions which have bound its community since 1975. The association contends new homeowners flouted the restrictions by (1) failing to follow their approved plans for grading and (2) installing a wooden structure without prior approval. To remedy these violations, the association seeks injunctive relief requiring the homeowners to regrade their property and remove the structure. The homeowners dispute these claims and argue that the deed restrictions are unenforceable as written, arbitrarily applied to them, or waived by the association. Both sides seek statutory fee shifting for having to litigate their dispute.

In this post-trial report, I find (1) the restrictions at issue are enforceable and were reasonably enforced by the association, (2) the homeowners violated the restrictions, (3) the homeowners failed to prove any of their affirmative defense, and (4) injunctive relief and fees should be awarded in the association's favor.

This is my final report.

## I. BACKGROUND[1]

This action is a dispute between RBY&CC East Side Homeowners Association, Inc. (the "Association"), a homeowners association responsible for a

---

[1] The facts in this report reflect my findings based on the record developed at trial on November 14, 2022 and November 15, 2022. *See* Docket Item ("D.I.") 54. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcripts are in the form "Tr. #." D.I. 55-56. The parties' jointly submitted exhibits 1-76, which were admitted without objection, are cited as "JX __." Tr. 3:8-14, 77:18-24.

neighborhood in Rehoboth Beach, Delaware (the "Community"), and Patrick and Tammy Beebe (the "Homeowners," with the Association, the "Parties") relating to real property located at 152 East Side Drive, Rehoboth Beach, Delaware 19971 (the "Property").[2]

## A. The Community and the Association

The Community is but one section within the greater Rehoboth Beach Yacht & Country Club area.[3] It is located between the Rehoboth Beach Country Club (the "Country Club") golf course and the Rehoboth Bay.[4] Roughly half of the lots in the Community back up to the water and half to the golf course.[5] Building within the Community began over twenty-five (25) years ago.[6] Of the Community's eighty-three (83) lots, only two are currently undeveloped.[7]

The Association was formed on October 24, 1995, and founded with the purpose to "maintain, operate and administer the common areas, roads and community facilities in [the Community,]" and "to enforce applicable covenants and

---

[2] JX 1, Ex. C. JX 1 included the complaint as Exhibit A, the verification as Exhibit B, and the exhibits to the complaint as Exhibits A-L. To avoid confusion, any citations to the complaint are to D.I. 1, not JX 1, and citations to Exhibits A-L are JX 1, Ex. __.

[3] Tr. 84:13-18.

[4] Tr. 85:20-86:2.

[5] Tr. 86:3-6.

[6] Tr. 117:14-16.

[7] Tr. 85:3-6.

restrictions[.]"[8] The members of the Association are "every owner of a lot" within the Community.[9]

On November 18, 1995, the Association adopted bylaws (the "Bylaws").[10] The Bylaws provide that "[t]he property, business and affairs of the Association shall be managed and controlled by its Board of Directors" the number of which would grow as more lots were sold.[11] During the relevant time, the Association's board had nine (9) members: Edgar Thomas ("Thom") Harvey, III; Rudolph C. Blancke; Betsy Baumeister; Bob Bolton; Joanne McGregor; Sally Hack; Paul Pfizenmayer; Joe Ashton; and Laura Grant.[12]

The Bylaws further provide that "[t]he Board of Directors may delegate certain items under its authority to various standing or special committees."[13] One

---

[8] JX 1, Ex. A.

[9] *Id.*

[10] JX 23.

[11] *Id.*

[12] Tr. 128:16-22. Two (2) members of the Association's board testified at trial: Thom Harvey and Rudolph Blancke. Mr. Harvey is the Homeowners' next-door neighbor within the Community. Tr. 207:22-24. He splits his time between his home in the Community and Wilmington, spending 40-50% of his year in the Community. Tr. 208:19-24. At the time of trial, Mr. Harvey had been the president of the Association's board for eight (8) years. Tr. 209:23-210:2. He testified that he did not anticipate being on the slate of directors for an upcoming meeting. Tr. 211:14-20. Rudolph C. Blancke, another homeowner within the Community, has served on the Association's board since 2017. Tr. 87:7-13, 88:1-6. Mr. Harvey and Mr. Blancke were both asked about the term limits in the Association's bylaws. *See* JX 23. These limits have been overlooked. Tr. 141:15-23; Tr. 210:5-13.

[13] JX 23.

of the Association's committees is the Architectural Review Committee (the "ARC"), which is responsible for approving plans and specifications for construction within the Community.[14]

Mr. Blancke, who has served on the ARC for about five (5) years, testified as to its composition and procedures.[15] The ARC is made up of four (4) members of the Association's board and works with an architect, Susan Frederick.[16] In Mr. Blancke's time with the ARC, the ARC has reviewed an average of twenty (20) applications a year.[17] Those applications include a variety of requests including "fence installations, additions, patios, new home builds, additions, renovations, new windows, [and] driveways."[18] In his time with the ARC, Mr. Blancke has reviewed five (5) applications from new home builds, including the Homeowners' application.[19]

Mr. Blancke further explained the ARC's process for reviewing a new home build application. The ARC first confirms that the application is complete, with all the plans and forms required by the Restrictions and ARC Manual, as defined

---

[14] JX 75, Art. D.

[15] Tr. 88:23-89:4.

[16] Tr. 89:13-22.

[17] Tr. 89:5-11.

[18] Tr. 89:15-19.

[19] Tr. 89:20-90:1.

below.[20]  If it is not, the ARC will work with the homeowners to complete the application.[21]  Once complete, the ARC will direct the homeowners to send the application to Ms. Frederick with a check for the amount due to her under a set fee schedule.[22]  Ms. Frederick then reviews the application and works with the ARC and homeowner toward final approval.[23]  In her review, Ms. Frederick uses a form which tracks the Restrictions, as defined below, and identifies whether the applicant has met those requirements and, if not, what they can do to correct or supplement the application.[24]  Ms. Frederick's review is then sent to the ARC and Ms. Frederick and the ARC work with the homeowner toward final approval.[25]  For final approval, three (3) members of the ARC and Ms. Frederick must sign off.[26]

To assist homeowners, the ARC has a guide and new build application (the "ARC Manual").[27]  The ARC Manual provides (1) detail about the documentation

---

[20] Tr. 94:19-95:1.

[21] *Id.*

[22] *Id.*

[23] *See* Tr. 95:2-21.

[24] *See* JX 1, Ex. G.

[25] *See* Tr. 95:2-21.

[26] Tr. 100:21-101:2. The ARC has approved landscaping plans for three properties within the Community: 128 East Side Drive, 166 East Side Drive, and 129 East Side Drive. JX 4, p. 6.  The retaining wall at 129 is wooden. Tr. 154:19-21; JX 35.  Exhibits purportedly showing additional, unapproved structures were introduced and addressed by Mr. Blancke; for many of the structures, Mr. Blancke could not recall if the structures were approved by the ARC. *See* JX 18, 30-33, 36; Tr. 160:19-163:5.

[27] JX 59.

and plans needed for review; (2) set back and drainage requirements; (3) specification requirements (including minimum square feet and which direction the house should face); (4) submission instructions; (5) landscaping and paving requirements; (6) restrictions specific to fences, walls, decks, and signs; and (7) construction guidelines.[28]

The ARC also has an architectural new construction application which provides time requirements: "All plans are to be submitted to the Architectural Review Committee (ARC) **thirty (30) days** prior to the initiation of constructions for review and approval or disapproval. The ARC will have 30 day[s] to review and approve/disapprove from receipt of **ALL the requested information**."[29] The form application specifies the following attachments, necessary "to fully detail and describe the new construction[:]"[30]

1. "Foundation plan, elevations, floor plans and cross section . . . prepared by a competent architectural designer[;]"[31]

2. A description of the materials to be used "including color, finish, and manufacturer's information[;]"[32]

---

[28] *Id.*

[29] JX 1, Ex. F (emphasis in original).

[30] *Id.*

[31] *Id.*

[32] *Id.*

3. A site plan showing the "home, driveway, walkways, decks, etc.[;]"[33]

4. "A lot grading plan which includes drainage and soil erosion considerations[;]"[34] and

5. A signed contractor's agreement, with the contractor's license and proof of insurance.[35]

The form application also addresses a landscape plan, which "should be submitted with [the] application but must be submitted no later than 60 days prior to completion of construction."[36]

## B. The Restrictions

This approval process is set forth in the deed restrictions that bind the Community. Properties within the Community, including the Property, are subject to two series of restrictions. The first set of restrictions was recorded with the Sussex County Recorder of Deeds on March 25, 1975 (the "March Restrictions").[37] Revised restrictions were then recorded with the Sussex County Recorder of Deeds on

---

[33] *Id.*

[34] *Id.*

[35] *Id.* The contractor's agreement requires the contractor to promise to abide by the Restrictions and maintain their construction in a safe and clean manner. *Id.* It further contains an agreement that construction will only be permitted "during the hours of 7:30 am to 5pm and not on Saturday, Sundays and/or Holidays[,]" with some exceptions. *Id.*

[36] *Id.*

[37] JX 75.

7

November 10, 1975 (the "November Restrictions" and together with the March Restrictions, the "Restrictions").[38]

Both the November Restrictions and the March Restrictions contain the following articles: Article A (Residential Uses), Article B (Prohibited Uses and Nuisances), Article C (Options to Repurchase), Article D (Approval of Plans and Specifications), Article E (Use of Roads and Waterways), Article F (Modification of Restrictions), and Article G (Organization and Operation of Property Owners Association). The restrictions at issue in this action are contained within Article D, which is nearly identical in the November Restrictions and the March Restrictions. Article D of the March Restrictions does, however, contain three (3) paragraphs not found in Article D of the November Restrictions. These paragraphs govern the construction of seawalls, the construction of boat landings or docks, and increasing the size of a lot by filling in water it abuts.[39] The third paragraph also contains a provision that "[t]he elevation of a lot will not be changed so as to materially affect the surface elevation or natural drainage of surrounding lots" (the "Materially Affects Provision").[40]

---

[38] JX 1, Ex. D.

[39] JX 75, Art. D.

[40] *Id.*

Article D in the November Restrictions and the March Restrictions (the "Restrictions") provides, in pertinent part:

> No building, structure, fence, wall, dock, bulkhead, seawall, swimming pool or other erection, shall be commenced, erected, maintained or used, nor shall any addition to or change or alterations therein, or in the use thereof, by made upon any of the lands conveyed by this deed, no matter for what purpose or use, until complete and comprehensive plans and specifications, prepared by a competent residential draftsman, showing the nature, kind, shape, height, materials, floor, elevation, foundation and footing plans, exterior color scheme, location and frontage of the lot, approximate cost of such building, structure, or other erection, and the grading and landscaping plan of the lot to be built upon or improved, shall have been submitted to and approved in writing by the party of the first part herein, its successors, assigns, or its Building Approval Committee provided for in this Article[.][41]

Regarding approval, the Restrictions provide that the Association or the ARC:

> shall have the right to refuse to approve any such plans or specifications, or grading or landscaping plans or changes, which are not suitable or desirable, in its or their sole opinion, for aesthetic, safety, health, police or other reasons, and in so passing upon such plans and specifications, or grading and landscape plans or changes, [the Association or the ARC] shall have the right to take into consideration such factors which in its or their opinion would affect the desirability or suitability of such proposed improvements, erection, alteration, or change.[42]

The Restrictions further restrict the free construction of certain structures through clauses providing "[n]o wall or fence of any height shall be constructed on any lot until after the height, type, design and location therefor shall have been approved in

---

[41] JX 1, Ex. D., Art. D.

[42] *Id.*

writing" and "[n]o solid walls shall be erected except in buffer zones shown on the plot."[43]

The Restrictions also expressly permit the creation of a committee like the ARC and detail the rights and responsibilities of the ARC, if created. Under the Restrictions, the ARC shall be "composed of three members, one of whom shall be an architect, of recognized standing in his or her profession[.]"[44] The Restrictions expressly permit the Association to delegate plan review and approval to the ARC and specify any appeal process for denials by the ARC.[45]

### C.    The Homeowners and the Property

Although the Homeowners are new homeowners within the Community, they are hardly strangers to it. Mr. Beebe is a licensed pilot through the Commonwealth of Pennsylvania and a partner with the Pilot's Association for the Bay and River Delaware.[46] A Delaware native, Mr. Beebe has lived in Sussex County and owned various properties with his wife, Tammy Beebe, throughout the Rehoboth Beach area.[47] Mr. Beebe has also been a member of the Country Club and frequented the

---

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] Tr. 297:22-298:1.

[47] Tr. 299:3-6.

10

Community "every day for the last 20 to 25 years."[48] Further, his parents have owned property in the Community and been members of the Association since 1998.[49]

The Homeowners purchased the Property, then a vacant lot, on November 9, 2020.[50] The Property is on East Side Drive, which is a paved road, approximately thirty (30) feet wide, with no curbs or shoulders.[51] It backs up to the ninth fairway of the County Club's golf course.[52] Before the Homeowners purchased the Property, the Association was responsible for its upkeep, including mowing.[53]

Historically, stormwater from the street would flow through the Property.[54] Those familiar with the Community and the Property testified consistently that, after heavy rain, the Property was "100 percent submerged[,]" and would have "ducks swimming on it."[55] The Property was frequently "unable to be mowed because it

---

[48] Tr. 299:7-10.

[49] Tr. 300:13-19.

[50] JX 1, Ex. C.

[51] Tr. 197:11, 208:1-4.

[52] Tr. 281:5-9.

[53] Tr. 215:14-23.

[54] Tr. 187:21-24.

[55] Tr. 214:14-16, 266:9-11.

was too wet."[56]  The Homeowners were aware of this historical ponding when they purchased the Property.[57]

The Homeowners' deed to the Property provides the Homeowners take the Property subject "to any and all applicable restrictions, reservations, conditions, easements and agreement of record in the Office of the Recorder of Deeds in and for Sussex County, Delaware."[58]  The Homeowners also received a copy of the ARC Manual from Mr. Blancke.[59]  The Homeowners attempted to comply with the Restrictions and the ARC Manual as they built their home.  But the process was protracted, at times hostile, and ultimately resulted in this litigation.

### i.    The Application Process

On December 22, 2020, the Homeowners submitted an architectural new

---

[56] Tr. 215:20-23. The Homeowners' other neighbor, Tucker Kokjohn, agreed and testified that the Property "was constantly flooded." Tr. 266:9.

[57] Tr. 364:5-14; JX 1, Ex. C. Expert witness, Mark Ziegler, testified that 'ponding" refers to standing water, which attracts bugs in warmer weather and creates icing conditions in the winter. Tr. 54:18-22, 56:20-57:3.  DelDOT employee, Matthew Schlitter, testified that there needs to be positive drainage off the roadway to avoid ponding, which can cause hydroplaning, "deterioration of the payment," and can otherwise "cause damage and become a safety issue for the traveling public." Tr. 198:2-12. Mr. Harvey explained "the other problem with ponding is you get cracks in macadam, if you are ponding water, lots and lots and lots of water goes through. It softens up the underbase and the road begins to come apart. You get to winter and the freeze/thaw cycle takes place, and it destroys the road." Tr. 245:14-20.

[58] JX 1, Ex. C

[59] Tr. 94:2-13; Tr. 322:17-20.

construction application and a contractor's agreement to the ARC.[60] At that time, the ARC consisted of Mr. Blancke, Paul Pfizenmayer, Joanne McGregor, and the ARC's architect, Susan Frederick.[61] Mr. Blancke was the chair of the ARC.[62] In that capacity, he reviewed the Homeowners' completed application with the contractor's agreement, signed by Don Lockwood of Lockwood Designs & Construction.[63] On the application, Mr. Blancke checked off the materials submitted and added various handwritten notes including a note that no construction could begin until the plans were approved.[64] He then directed the Homeowners to submit the application for Ms. Frederick's review.[65]

The Homeowners sent their application, as directed, with the appropriate fee.[66] Ms. Frederick replied via email on January 2, 2021 to Mr. Beebe, noting that certain required plans were missing.[67] Specifically, she asked for a placement survey, grading plan, landscape place, drainage plan, permit entrance application

---

[60] JX 1, Ex. F; Tr. 102:23-103:1.

[61] Tr. 126:11-19.

[62] *See* Tr. 257:1-5.

[63] *See* JX 60.

[64] *See id.*

[65] Tr. 94:21-95:7.

[66] Tr. 94:19-95:7.

[67] JX 25.

and/or approval, and an additional fee if the Homeowners were seeking review and approval of a pool, which was a separate review.[68]

Without any additional submissions from the Homeowners, on January 24, 2021, Ms. Frederick submitted her completed review to the ARC.[69] In her cover letter, Ms. Frederick identified the documents missing from the submission "a placement survey, drainage plan, a final grading plan and a landscape plan."[70] Ms. Frederick further noted that "[a] plan of the intended final grading and how storm water will be managed is extremely important."[71]

To remedy these deficiencies, Mr. Beebe submitted a hand-drawn drainage plan sketch and landscape plan sketch to Mr. Blancke via email on January 28, 2021.[72] Mr. Beebe drew the handwritten plans himself after consulting with landscapers and planned for runoff from the Property to be conveyed to a catch basin three lots down, using East Side Drive as a conveyance.[73] The plans did not depict any retaining wall or landscape barrier in the Property's backyard.[74]

---

[68] *Id.* Mr. Beebe emailed Ms. Frederick on January 27, 2021, addressing a follow up submission, which appears to have been submitted the next day. JX 52.

[69] JX 1, Ex. G.

[70] *Id.*

[71] *Id.*

[72] JX 53.

[73] *Id.* Tr. 392:13-18.

[74] *Compare* JX 53 *with* JX 19.

14

On January 29, 2021, the ARC provided the sketches to Ms. Frederick for review.[75] Mr. Blancke instructed Ms. Frederick to expedite her review because he wanted to provide a timely response to the Homeowners.[76] After her expedited review, Ms. Frederick still had concerns.[77] She noted "[a] grading plan is still missing" and "knowing what the final grading will be is important."[78] She also noted that "[w]ithout grades, I can only guess that his plan will be executed correctly."[79] Ms. Frederick reflected on the lack of standards for her to judge the plans by, stating "there aren't really any standards I can rely on for what an applicant is required to submit, other than it has to be something that has enough information for me to review and find to work."[80] But, with the ongoing uncertainty as to the Homeowners' definitive plans she recommended that the Homeowners "be put on notice that any changes to the plan as submitted and reviewed **will require [the Homeowners] to resubmit.**"[81]

Contemporaneously with Ms. Frederick's review, Mr. Blancke worked to ensure the ARC could provide their final decision promptly. Consistent with the

---

[75] JX 21.

[76] Tr. 100:2-6.

[77] JX 21.

[78] *Id.*

[79] *Id.*

[80] JX 53.

[81] JX 21 (emphasis in original).

15

ARC's standard practice, three (3) members of the ARC and Ms. Frederick needed to approve the plans; with one (1) member of the ARC out of town, Thom Harvey served as a substitute member of the ARC.[82]

In February 2021, Mr. Blancke, Mr. Beebe, Mr. Beebe's contractor (Don Lockwood), and a Delaware Department of Transportation ("DelDOT") employee, Matthew Schlitter, met at the Property to discuss "the process, the application, and the drainage issue."[83] Mr. Blancke recalls those present discussing the need for a stormwater management plan.[84] Mr. Schlitter explained he was working with the Homeowners on entrance permits required because East Side Drive is a DelDOT maintained road.[85] He attended the meeting at Mr. Beebe's invitation, to address drainage and approval of entrances.[86] Beforehand, Mr. Schlitter looked at historical LiDAR maps of the area and noted "existing drainage issues with adjacent

---

[82] *See id.* Mr. Blancke testified that Joanne McGregor was in Florida and unable to return and participate as a member of the ARC, creating the gap for Mr. Harvey to fill. Tr. 200:11-20. *See also* Tr. 213:23-214:4. Mr. Beebe testified that he never knew Mr. Harvey was acting as a member of the ARC. Tr. 324:20-23.

[83] Tr. 96:22-97:2, 387:11-388:8.

[84] Tr. 102:2-7. Per Mr. Blancke, he received drainage plans for the other new builds he approved as a member of the ARC. Tr. 102:14-18.

[85] *See* Tr. 186:14-188:4.

[86] Tr. 186:23-187:6. Mr. Beebe submitted two entrance permits for approval. The first permit was approved on November 20, 2020, for a single entrance. JX 61. The second permit was approved on February 18, 2021, for a second entrance. JX 62.

properties."[87]   Mr. Schlitter also confirmed that the roadside drainage historically flowed through the Property into the rear of the Property.[88]   Mr. Schlitter wanted to discuss those issues with Mr. Beebe to ensure the construction "didn't create bigger issues to the State roadway."[89]

These requirements and the delay in approval led to contentious discussions among the Homeowners and members of the ARC.  Mr. Blancke testified that he had "[s]everal conversations" with Mr. Beebe about the outstanding matters that needed to be resolved for final approval.[90]   He urged Mr. Beebe to get all the requested documentation submitted, but Mr. Beebe was resistant and threatened to refer the matter to his attorney.[91]   Mr. Harvey likewise communicated the ARC's expectations and requirements to Mr. Beebe, but his advice was not well received.[92]

Mr. Harvey's discussions with Mrs. Beebe went better.[93]   Mrs. Beebe explained that she entered the discussions "hoping to soften some edges" and have "more reasonable conversations."[94]   She "felt like there was a little too much

---

[87] Tr. 187:14-20.

[88] Tr. 187:21-24.

[89] Tr. 187:24-188:2.

[90] Tr. 148:5-11.

[91] Tr. 148:14-149:9.

[92] Tr. 227:11-19.

[93] JX 55.

[94] Tr. 455:2-7.

17

testosterone in the room, honestly."[95]  And her involvement helped.  On February 18, 2021, Mrs. Beebe sent a text message to Mr. Harvey seeking guidance on the changes that needed to be made to the Homeowners' application.[96]  Mr. Harvey responded that same day explaining the ARC needed "a plan including all calculations by a registered professional Delaware civil engineer showing the design of the storm water management plan for your lot. Any registered civil engineer can create this plan."[97]

Mr. Beebe then took that February 18, 2021 text message to several firms to prepare the requested lines and grades plan.[98]  One such firm was the Kercher Group, Inc. (the "Kercher Group").[99]  The Kercher Group prepared a grading plan and on March 4, 2021, the Homeowners submitted that plan (the "Kercher Plan") to the ARC.[100]

Thereafter, the Homeowners expected prompt approval. But they received additional pushback.  Sometime thereafter, Mr. Beebe and Mr. Blancke had another contentious conversation and Mr. Harvey sent a text message to Mrs. Beebe to

---

[95] Tr. 455:7-8.

[96] JX 27.

[97] *Id.*

[98] Tr. 403:23-404:5.

[99] Tr. 404:6-8.

[100] JX 54.

18

intercede.[101]  In his message, Mr. Harvey explained the Parties could move forward to get attorneys involved but "it seems silly to go in that direction when [Mr. Harvey was] ready to approve[.]"[102]  Despite being ready to approve, Mr. Harvey specified three (3) things, which he thought would be helpful to the Homeowners and the Property.[103]  Mrs. Beebe thanked Mr. Harvey for his suggestions and asked: "So we have approval?"[104]  His answer: "When you answer the 3 points with specificity."[105]

Mr. Beebe then emailed Mr. Harvey on March 8, 2021 to explain Mr. Harvey's "concerns are noted, and have been appropriately addressed[.]"[106]  But Mr. Harvey was not satiated; he demanded a response to each of his three (3) points to "move the ball forward."[107]  Less than thirty (30) minutes later, Mr. Beebe responded point by point.[108]

---

[101] *See* JX 27.

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *Id.* Mr. Harvey testified that these three (3) items were not requirements of the ARC or the Association. Tr. 221:15-19. Rather, he contends he was trying to be helpful based on his experience with construction. Tr. 221:5-7. *See also* Tr. 221:24-222:5. Mr. Harvey explained that, by the time he sent these texts, he could no longer trust Mr. Beebe; per Mr. Harvey, "Mr. Beebe had multiple times lied to [Mr. Harvey]." Tr. 224:20-23.  Their issues started when Mr. Beebe "dug through the utility easement" without first calling the utility company. Tr. 224:23-225:1. Mr. Harvey tried to inform and teach Mr. Beebe, but Mr. Beebe was not receptive to the lesson. Tr. 225:6-226:7.

[106] JX 28.

[107] *Id.*

[108] *Id.*

With those concerns resolved, on March 8, 2021, Mr. Harvey approved the Kercher Plan; Mr. Blancke and Mr. Pfizenmayer, the other members of the ARC, approved the next day.[109] The Homeowners were notified of the full approval on March 9, 2021, and signed the approval letter.[110] The approval letter included a requirement that "[a]ny changes to the approved plans submitted will require ARC review & approval prior to any work beginning."[111] The Homeowners were further "required to submit an 'As Built' Survey & 'Certificate of Occupancy' upon completion of the home construction."[112]

## ii. The Construction

Although Mr. Lockwood signed the contractor agreement and worked with the Homeowners and the ARC through the approval process, he did not act as general contractor for the construction at the Property.[113] Rather, Mr. Beebe decided he was going to act as project manager and work with "several different contractors and a construction consultant," like he had done for other construction projects.[114] With

---

[109] JX 24.

[110] D.I. 41, § 2(S).

[111] JX 24.

[112] *Id.*

[113] Tr. 102:19-103:6.

[114] Tr. 328:12-18. With this new team, the Homeowners made various changes to the plans submitted. For example, although they originally contemplated building a pool, they decided not to. *Compare* JX 53 *with* JX 20. Mr. Beebe explained that although it looked good on paper, it was unnecessary, and they decided not to build. Tr. 311:7-16.

COVID and supply chain issues, it took eight months to construct the primary residence on the Property.[115] Ultimately, the Homeowners finished construction on or around December 27, 2021, received their certificate of occupancy on January 18, 2022, and moved in thereabouts.[116]

The Property was not, however, graded until after construction. For that, the

---

[115] Tr. 327:19-328:13.

During the construction, neighborly tensions increased. The Homeowners, admittedly, permitted some construction outside the approved hours and the ARC's attempts to visit the Property to address those issues and others were rebuffed. Tr. 411:21-414:14. *See also* JX 56. On October 11, 2021, Mr. Harvey sent Mr. Beebe a scathing email regarding this issue, instructing Mr. Beebe to "grow up and stop [his] stupid and empty threats and try, just try to contain [his] miserable self and follow the rules[.]" JX 16. Mr. Harvey admitted he "was pretty angry" when he wrote the email; "angry about wasting time." Tr. 230:6-10. Mr. Harvey explained that he told Mr. Beebe to "use [his] head" and "stop the histrionics" because Mr. Beebe had threatened to sue him and Mr. Blancke, called the police on Mr. Blancke, and filed a trespassing charge against Mr. Blancke when he tried to do an inspection of the Property. Tr. 227:11-15. *See also* Tr. 412:8-414:13 (Mr. Beebe describing the police incident); Tr. 458:7-16 (Mr. Blancke disputing the allegations of unauthorized entry into the Property); JX 1, Ex. D, Art. D. (providing the Association or the ARC the "the right from time to time during the period that constriction of any dwelling progresses and at the completion of any particular dwelling or during the period of repairs are being made to any dwelling, to go upon the premises where the dwelling is located and make certain that such construction and/or repairs are in accordance with the approved plan for said dwelling and not violative of [the Restrictions]"). Mr. Harvey further admitted that, by the time of trial, he and Mr. Beebe "don't get along." Tr. 243:3-4. Nonetheless, Mr. Harvey believes he was objective in reviewing the Homeowners' application to the ARC. Tr. 243:23-24. Mr. Beebe described his relationship with his neighbor as "[s]trained." Tr. 336:16-19.

[116] Tr. 328:15-16, 444:14-19. JX 45. The certificate of occupancy includes a twenty-four (24) inch high retaining wall (the Structure, as defined herein). JX 45. Mr. Beebe testified that he asked for that special approval based on the ARC's concerns and the uncertainty from the County regarding the definition of a retaining wall. Tr. 445:5-447:8.

21

Homeowners worked with José Diaz.[117] Mr. Diaz "did the grading, partial landscaping."[118] Mr. Diaz was not given the Kercher Plan, nor instructed to follow the grading outlined therein.[119] But Mr. Beebe explained that he told Mr. Diaz "we need to have swales on the side to get the water from the front of the property to the – to the back."[120] Mr. Diaz then "graded the entire property and . . . sodded 60 percent of the property."[121] Mr. Beebe sodded the rest.[122] By March of 2022, the Property was fully sodded.[123]

The Homeowners also did some unapproved landscaping. In mid-November 2021, the Homeowners hired Tommy Engel of Double E Landscaping to install a landscaping border towards the rear of the Property (the "Structure").[124] Mr. Engel proposed the Structure as a border to keep water from entering the Property from the

---

[117] Tr. 329:9-16.

[118] Tr. 329:10.

[119] Tr. 329:17-19.

[120] Tr. 329:23-330:2.

[121] Tr. 330:10-12. Mr. Beebe could not recall how much he paid Mr. Diaz for his services. Tr. 450:2-5.

[122] Tr. 330:20-21.

[123] Tr. 330:23-5. The failure to give Mr. Diaz the Kercher Plan is especially concerning is light of Ms. Frederick's January 28, 2022 email to Mr. Beebe reiterating the drainage concern and the need to stick to the Kercher Plan. JX 58.

[124] Tr. 331:7-14; Tr. 332:15-24. Because the Parties dispute whether this is a retaining wall or a landscape border, I use the more generic term "Structure."

golf course and to keep mulch in place for planting.[125]  The Homeowners paid Mr.

Engel around $6,000.00 to install the Structure, made of six-by-six wooden beams,

between November 12-15, 2021.[126]  Initially, the Structure was eighteen (18) inches

in total, with twelve (12) inches above ground and six (6) inches underground.[127]  As

Mr. Diaz did the grading, though, he determined the Structure was too high and took

off the top layer, leaving the Structure with six (6) inches below, and six (6) inches

above, the ground.[128]

When Mr. Blancke became aware of the construction, which was not depicted

on the approved plans, he contacted Mr. Beebe for a meeting.[129]  On November 15,

2021, Mr. Blancke sent Mr. Beebe an email identifying the issues that needed to be

resolved, namely the discrepancies between the approved plans and the ongoing

construction.[130]  Mr. Beebe emailed that he had previously submitted his landscaping

plan and attached what he called "an additional copy."[131]  But it was not an

---

[125] Tr. 331:19-332:13.

[126] Tr. 332:10-18, 450:14-16.

[127] Tr. 332:18-22.

[128] Tr. 333:10-17.

[129] Tr. 108:3-22. Mr. Beebe admitted that the Homeowners did not ask for approval before the Structure was installed. Tr. 341:6-7. He did not, however, concede that approval was required and, if it was, he testified the Homeowners were unaware of any requirement. Tr. 341:7-9. Per Mr. Beebe, "[a]s soon as they said, you need to get approval for this, [the Homeowners] submitted what they requested." Tr. 341:9-10.

[130] JX 69.

[131] JX 19, JX 69.

"additional copy"—it was a new draft which, for the first time, reflected the Structure.[132] Mr. Beebe testified that he printed the prior plan, drew the line depicting the Structure, scanned it in, and emailed it.[133] Mr. Blancke responded on November 16, 2021, indicating those plans were insufficient and that there needed to be an on-site meeting.[134]

When Mr. Beebe declined a meeting, Mr. Blancke directed the Association's property manager, Chris Redefer with Rehoboth Bay Services LLC, to get involved.[135] Mr. Redefer sent Mr. Beebe a letter on November 19, 2021, demanding that Mr. Beebe follow the approved plans for the construction on the Property (the "Redefer Letter").[136] Shortly thereafter, on November 22, 2021, counsel to the Association sent a cease-and-desist letter to the Homeowners.[137]

The Homeowners responded to the Redefer Letter arguing that (1) the modifications were approved by the county and previously submitted to the Association, (2) the concerns were part of a pattern of harassment by certain

---

[132] Tr. 395:19-396:5.

[133] Tr. 401:6-11.

[134] JX 68.

[135] Tr. 110:1-111:1.

[136] JX 14. The Redefer Letter further raised concerns about excavation of common area adjacent to the Property and fill that appeared to be in wetlands area. *Id.*

[137] JX 1, Ex. K. *See also* JX 76 (January 17, 2022 follow up email from counsel to the Association); JX 71 (February 21, 2022 follow up letter from the Association's counsel to the Homeowners).

members of the ARC, and (3) certain members of the ARC also trespassed and otherwise interfered with the construction.[138] The Homeowners emailed their response to Laura Grant, Joe Ashton, and Betsy Baumeister, three (3) members of the Association's board.[139] They explained they "would be happy to meet with anyone on the Board copied [t]herein[,]" expressly excluding the ARC members, Mr. Blancke, Mr. Harvey, and Mr. Pfizenmayer.[140] Mr. Beebe testified he was excluding those persons because "they were treating [the Homeowners] in a manner that [they] didn't feel was right, and [they] wanted some neutral parties in the meeting."[141]

Thereafter, Mr. Beebe started a campaign to whip up support within the Community. On November 30, 2021, Mr. Beebe reached out to Sally Hack, a new member of the ARC, about her involvement with the ARC and the demand letter, and reiterated his concerns about Mr. Blancke and Mr. Harvey.[142] Then, in December of 2021, Mr. Beebe "went around and knocked on pretty much everybody's door[,]" to discuss the dispute over the Structure and solicit his

---

[138] JX 72.

[139] JX 73.

[140] JX 72.

[141] Tr. 352:19-20.

[142] JX 11.

neighbors' approval.[143] Altogether, he secured forty-two (42) signatures on his petition.[144]

On December 31, 2021, Mrs. Beebe left a message for Mr. Blancke, seeking to discuss the ongoing issues.[145] Mr. Blancke responded by email, copying the ARC and its legal counsel, and explained any further communications should occur through the Parties' attorneys.[146]

Despite this instruction, Mr. Beebe submitted new plans to Ms. Frederick on January 26, 2022.[147] Mr. Blancke informed Ms. Frederick that the Association was pursuing legal action against the Homeowners and that she should not review the latest submission.[148]

The Homeowners were still required, however, to submit an as-built. In an email sent November 22, 2021, the Association's counsel requested that the Homeowners submit "an amended plan showing the as-built home[.]"[149] In January of 2022, the Homeowners submitted an as-built (the "As-Built") to Ms. Frederick

---

[143] Tr. 343:4-344:4.

[144] Tr. 344:20; JX 26.

[145] *See* JX 13.

[146] *Id.*

[147] JX 58. These new plans were the first document from the Homeowners that showed anything like the Structure. *Compare* JX 20 *with* JX 53. *See also* Tr. 115:15-18.

[148] JX 29.

[149] JX 70.

with a check for $100.[150] Mr. Beebe could not recall the name of who drafted the As-Built, which is unsigned and notes two (2) potential drafters (Devon Engineering or Architectural Drafting & Design, LLC).[151] The same person who drew the original plans for the Homeowners' house prepared the As-Built without viewing the finished build.[152] The As-Built included the Structure at the rear of the Property.[153]

Ms. Frederick emailed Mr. Beebe on January 28, 2022, expressing concerns with the As-Built.[154] Specifically she was concerned "that the site work did not match an engineered drainage plan" which made it so she could not review the As-Built effectively.[155]

On January 28, 2022, Mr. Beebe sent the As-Built to the Kercher Group for review.[156] John Murray, a project manager at the Kercher Group, sent Mr. Beebe a letter stating that the Structure should not interfere with the Kercher Plan.[157] Mr.

---

[150] Tr. 354:17-355:3. *See* JX 20.

[151] JX 20; Tr. 421:12-422:9.

[152] Tr. 422:2-5, 20-24.

[153] *See* JX 20.

[154] JX 58.

[155] *Id.*

[156] JX 22.

[157] *Id.* Mr. Beebe explained that he requested this letter because of Ms. Frederick's inquiry, and it was prepared without anyone from the Kercher Group visiting the Property. Tr. 425:20-24. But the Kercher Group asked for pictures and Mr. Beebe "did what the Kercher Group asked." Tr. 449:3-6.

Murray did not address whether the Kercher Plan was followed. Mr. Beebe testified that he sent this letter to Ms. Frederick.[158]

### iii. The Aftermath

There is no dispute that there continues to be ponding around the Property's right of way and neighboring properties.[159] The issues come and go. Tucker M. Kokjohn, the Homeowners' neighbor, explained that the ponding at the front of his property is about the same as it was before the construction on the Property.[160] In the nineteen (19) years he has lived there, he has always had ponding near his mailbox, requiring him sometimes to "either not wear shoes or wear galoshes to get the mail."[161] The construction did not worsen the situation.[162] And in his backyard, the ponding has improved since the Homeowners' construction; he does not "get as

---

[158] Tr. 358:6-10.

[159] *See* Tr. 369:17-370:6.

[160] Tr. 263:11-12.

[161] Tr. 262:15-16.

[162] Tr. 262:11-12. Elizabeth Vasilikos, who lives less than three-quarters of a mile from the Property testified similarly. A frequent runner and walker, she has passed by the Property numerous times both before and after construction. Tr. 272:12-22. She always noticed ponding after it rained. Tr. 273:16-17. After the Homeowners' construction, the ponding, to her, looks "absolutely the same." Tr. 273:21. Ms. Vasilikos does not support the Association's lawsuit and, rather, supports the Homeowners and the Structure. Tr. 274:22-275:9.

Mr. Beebe also testified that he has "been jogging this road for 20 years, but sometimes you have to zigzag your way around[,]" due to ponding water. Tr. 432:24-434:1.

much water in the backyard as [he] got before [the Homeowners] did [their] landscaping."[163]

Mr. Schlitter testified that when he visited the Property on October 14, 2021 one (1) day after it rained, he "didn't observe any issue with drainage at that time."[164] Mr. Schlitter could, however, see that "[t]here were no swales in the right-of-way. [The Property] did have two swales on either side."[165]  Mr. Schlitter explained that the right-of-way as constructed was "compliant" with the permit but DelDOT "did not make the determination of whether or not [the right-of-way swales] conveyed positive drainage on site, [because of] the sod thickness and [they] needed more survey information."[166]

In July of 2022, the General Manager of the Country Club, Carpiu Chereches, visited the Property.[167]  Mr. Chereches was able to view the Structure, and consider

---

[163] Tr. 262:23-263:3. Mr. Kokjohn testified that he does not support the Association's lawsuit and signed a petition in support of the Structure. Tr. 263:21-264:11.

[164] Tr. 188:17-23.

[165] Tr. 188:24-189:7.

[166] Tr. 190:19-191:3. Mr. Schlitter noted, however, that the river rock shown in pictures of the Property was not compliant because "[t]here is no safety permit for that work." Tr. 196:11-15. Per Mr. Schlitter, "river rock is not allowed to be placed in the right-of-way" because it is not a reliable surface for a vehicle to transverse; it is bumpy and can give way to sinkage. Tr. 196:18-197:7. But many homeowners within the Community also have river rock, which was not approved. Tr. 365:23-366:4.

[167] Tr. 280:19-21.

whether it harmed the golf course.[168]  He found there was no effect and was pleased

with the Structure.[169]  At the Homeowners' request, Mr. Chereches then wrote a

letter in July 2022 explaining "[w]ith the new construction came a new low-profile

garden wall [(the Structure)] that we went out to see if it would impact our golf

course in any way, and the conclusion was that it doesn't. If anything, it was looked

at as an ingenious construction."[170]

Thereafter, the Association had McBride and Ziegler, Inc. ("McBride")

perform a survey of the front of the Property to determine if it was graded according

to the Kercher Plan.[171]  McBride's Chief of Surveys, Devon Gaunt, testified that on

October 18 and 19, 2022, he went to the Property to take elevations of the grading

---

[168] *See* Tr. 282:14-19.

[169] Tr. 282:14-16.

[170] JX 15. *See also* Tr. 284:5-7.

Mr. Chereches also drives on East Side Drive frequently and has observed ponding on the road and in the rights-of-way. Tr. 286:5-17. Ms. Vasilikos testified similarly, explaining that when there is a nor-easter or hurricane, the ponding on East Side Drive is "pretty significant." Tr. 277:5-6. Similarly, Mr. Harvey noticed ponding in front of the Property and neighboring properties after Hurricane Ian in 2022. Tr. 232:20-22. At the height of the storm, "the ponding [was] out to the mid point, almost to the mid point of the road." Tr. 235:20-22. "[A]pproximately 30 hours after the last rain fell[,]" there was water ponding at the end of the Property's driveway and neighboring property 150 East Side Drive and in the river rock. *See* JX 67. Mr. Beebe explained these conditions were after the area received over three (3) inches of rain in a two-day period. Tr. 360:6-16.

[171] JX 74. McBride and Mr. Gaunt have a longtime working relationship with Mr. Harvey who is the president of the Association. *See* Tr. 31:7-23. Mr. Gaunt testified that his survey was accurate and his findings unaffected by that relationship. Tr. 32:12-19. Mr. Ziegler confirmed the same. Tr. 45:3-6.

in the front yard and the street.[172]  The Homeowners were not asked if the survey could proceed, nor provided notice that it was occurring.[173]  Rather, Mr. Beebe happened upon the surveyors and, finding their answers evasive and conduct suspicious, called the State Police.[174]  Luckily, all involved treated each other respectfully and the situation did not escalate.

Mr. Beebe made it clear, however, that Mr. Gaunt and his team did not have permission to enter the Property.[175]  They complied and conducted the survey from an adjacent property.[176]  Using a Leica TS12 robotic total station, Mr. Gaunt measured the front of the Property.[177]  Mr. Gaunt took "shots" with his instrument pointed at the Property and the instrument electronically recorded and calculated the elevation of the portion of the Property in the shot.[178]  Mr. Gaunt then loaded that

---

[172] Tr. 8:3-10.

[173] Tr. 373:21-23.

[174] Tr. 375:21-376:2.

[175] Tr. 14:2-13.

[176] On a sunny day, with no water on the ground, the McBride representatives did not personally witness any ponding. Tr. 11-17. But their survey demonstrated that the grading of the Property did not match the Kercher Plan. *See* JX 74.

[177] Tr. 9:13-22.  Mr. Gaunt explained that although he has surveyed property without entry before, it is customary to enter the property. Tr. 22:10-16, 14-19.  He testified credibly that it would not have assisted him with this assignment if he had permission to enter the land. Tr. 11-13. Mr. Ziegler confirmed the same, explaining he felt he "had adequate information" without entry to the Property. Tr. 64:17-65:6.

[178] Tr. 11:22-12:18. Mr. Beebe raised a concern about whether the "shots" were level because he witnessed the McBride team using equipment atop a pile of stones. Tr. 380:5-16.

electronic data into AutoCAD, a computer drafting program, which created a report demonstrating the various shots and elevation reflected.[179] Mr. Gaunt and his boss, Mark Ziegler, then manually reviewed the computer-generated report for accuracy and to prepare written findings.[180]

Mr. Ziegler, who was tendered as an expert in stormwater management (without objection), drafted the written findings (the "Ziegler Report").[181] In the Ziegler Report, Mr. Ziegler compared the computer-generated report, based on Mr. Gaunt's measurements, with the Kercher Plan.[182] In the Kercher Plan, Mr. Ziegler noticed "a one-foot elevation bust along the edge of [the] pavement," which resulted in a "range of elevations that weren't correct."[183] But "from a design perspective," the mistake was not material and, rather, would have permitted water to drain more easily, if the Kercher Plan had been followed.[184] But it was not. The computer-

---

[179] Tr. 12:1-9.

[180] *See* JX 74.

[181] *See id.* At trial, potential typographical errors in the Ziegler Report were identified. *See* Tr. 18:13-21, 19:24-20:4. Mr. Gaunt's testimony regarding the instrument and drafting program alleviated any concerns that the report contained material errors. *See* Tr. 9-13. *See also* Tr. 73:11-22. Mr. Ziegler testified that changes in elevation were a result of the slope of the street. *See id.*

The Homeowners point out that the Ziegler report does not provide any vertical datum. Vertical datum are reference points by which all other elevations are measured in comparison. Tr. 26:6-12.

[182] Tr. 46:9-15.

[183] Tr. 4-9.

[184] Tr. 47:22-48:23.

generated report and Mr. Ziegler's personal observations from viewing the Property a week after Mr. Gaunt's survey confirmed the swales depicted on the Kercher Plan were not present.[185] Mr. Ziegler also found in the Ziegler Report that stormwater runoff was not draining as designed and was instead remaining in the street, due in part to the edge of the stone bed being higher than the street.[186] Without the swales, per Mr. Ziegler, water is being conveyed to the front of the Property, rather than the rear, as it would under the Kercher Plan.[187]

Mr. Ziegler also reviewed the As-Built. He testified that when his firm works on residential land development projects, they prepare topographic and boundary surveys, design the property, and calculate the elevations and grading.[188] After construction, McBride then prepares the "as-builts."[189] Mr. Ziegler explained "in most jurisdictions, we are required to do the as-builts to ensure that the plan that was proposed was built in accordance with plans. In accordance to the plan that was

---

[185] Tr. 49:17-23. Mr. Ziegler also reviewed "Google Earth, . . . street view and . . . the GIS maps that are on the Sussex County web page[.]" Tr. 63:21-64:1. Mr. Beebe described Mr. Ziegler's visit as much less pleasant than Mr. Gaunt's. *See* Tr. 382:20-383:3.

[186] The report and cover letter were generated quickly, within five (5) days of the survey. JX 74. Mr. Gaunt testified that he was instructed to produce his findings quickly, although he was not aware of this litigation at the time he visited the Property. Tr. 29:3-23. Despite the quick turnaround, Mr. Gaunt is confident in the accuracy of the report. Tr. 32:8-11.

[187] Tr. 58:2-4.

[188] Tr. 36:22-37:7.

[189] Tr. 37:8-9.

33

approved."[190] Based on his experience, the As-Built was "[a]bsolutely 100 percent not" what he would expect to see as an as-built.[191] In his view the As-Built had a number of issues: (1) it was unsigned; (2) it depicted two fences that did not exist; (3) it failed to show elevations or the stone beds in the street; and (4) it had no information to "tell which way the water drains."[192]

### D. Procedural Posture

After unsuccessful efforts to resolve their dispute, on May 18, 2022, the Association filed this action seeking (1) injunctive relief requiring the Homeowners "to remove the [Structure] and regrade the Property in conformity with the [Kercher] Plan;" (2) a declaration that the ARC can, with notice, inspect the Property for compliance; and (3) shifting of fees and costs.[193] After the Association filed the certification required under Court of Chancery Rule 174(c)(2), I found this action eligible to proceed under 10 *Del. C.* § 348 and referred the Parties to mandatory mediation.[194] Mediation was held on July 15, 2022, but was unsuccessful.[195]

---

[190] Tr. 37:8-14.

[191] Tr. 40:1-14.

[192] Tr. 40:16-41:18.

[193] D.I. 1. *See* JX 14, 70, 71, 76. The Association's board authorized the lawsuit by unanimous written consent on May 9, 2022. JX 46.

[194] *See* D.I. 2, 6, 8-9.

[195] *See* D.I. 16.

On August 5, 2022, I approved the Parties' proposed schedule and set this matter for trial beginning on November 14, 2022.[196] Trial commenced as scheduled and was continued into November 15, 2022.[197] Thereafter, the Parties agreed to a schedule for post-trial briefing and completed that briefing on February 23, 2023.[198]

## II. ANALYSIS

The restrictions at issue in this case are commonly referred to as architectural review covenants, in that they require prior review and approval of plans for improvements. These types of covenants are "neither new nor uncommon in Delaware" but they "must be carefully evaluated because their arguably subjective nature introduces the risk of arbitrary and capricious application."[199]

The Association bears the burden of proving the Restrictions (1) are enforceable, (2) were not arbitrarily or capriciously applied to the Homeowners, and (3) were violated by the Homeowners.[200] The Association also bears the burden of proving entitlement to injunctive relief.[201] The Homeowners bear the burden of

---

[196] D.I. 19.

[197] D.I. 53. The first day of trial was the Homeowners' twenty-fourth wedding anniversary. Tr. 299:18-22.

[198] *See* D.I. 57-58, 63.

[199] *Lawhon v. Winding Ridge Homeowners Ass'n, Inc.*, 2008 WL 5459246, at *5 (Del. Ch. Dec. 31, 2008).

[200] *Id.*

[201] *O'Marrow v. Roles*, 2015 WL 5714847, at *11 (Del. Ch. Sept. 30, 2015).

proving their affirmative defenses of unclean hands and waiver.[202] Whichever party prevails on their claims is then entitled to statutory fee shifting, unless the non-prevailing party can demonstrate an exception thereto.[203]

The burden of proof for these claims and defenses is by a preponderance of the evidence. "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[204] "By implication, the preponderance of the evidence standard means that if the evidence is in equipoise," the party with the burden of proof loses.[205]

Applying this burden, I first address whether the Restrictions are enforceable on their face. Finding they are, I then turn to whether the Restrictions were arbitrarily enforced against the Homeowners. They were not. Thus, I address whether the Homeowners violated the Restrictions with their grading and the Structure. They did. That brings me to the Homeowners' affirmative defenses—waiver and unclean hands. I find neither avenue precludes judgment in favor of the

[202] *See Niehenke v. Right O Way Transp., Inc.*, 1996 WL 74724, at *2 (Del. Ch. Feb. 13, 1996) (citations omitted).

[203] 10 *Del. C.* § 348(e).

[204] *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (citations and quotation marks omitted).

[205] *OptimisCorp v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015).

Association.  Finally, I turn to the relief requested by the Association: (1) injunctive relief and (2) fee shifting.  I find this relief should be granted.

## A.     The Restrictions are enforceable.

For deed restrictions to be enforceable under Delaware law, they must serve a legitimate purpose and provide homeowners with sufficient notice of what conduct would be appropriate.[206]  "[F]undamental fairness requires that a property owner be given notice, whether written or *de facto*, of the specific requirements to which the[ir] building plans must conform for those plans to receive . . . approval."[207]  As explained by Vice Chancellor Noble, "[a]dequate notice means communicating the demands of compliance; whether that be a 10-foot-setback or a certain architectural style.  Restrictive covenants which are too vague to serve these functions of notice and fairness are unenforceable."[208]  That is because "if the language of a restrictive covenant is so vague that it does not provide 'clear, precise, and fixed standards of application,' there is a risk of arbitrary or capricious decision-making by the entity reviewing the homeowner's request. In such cases, the restriction will be deemed unenforceable by the court."[209]

---

[206] *Canal Corkran Homeowners Ass'n, Inc. v. Petrone*, 2017 WL 1450168, at *4 (Del. Ch. Apr. 21, 2017).

[207] *Seabreak Homeowners Ass'n, Inc. v. Gresser*, 517 A.2d 263, 270 (Del. Ch. 1986), *aff'd*, 538 A.2d 1113 (Del. 1988) (citations omitted).

[208] *Lawhon*, 2008 WL 5459246, at *5 (citations omitted).

[209] *Canal Corkran Homeowners Ass'n, Inc.*, 2017 WL 1450168, at *4 (citation omitted).

When reviewing the Restrictions for enforceability, I am guided by contract-interpretation principles. "Interpreting deed restrictions is a matter of contract interpretation and provisions are construed by determining original intent from the plain and ordering meaning of the words."[210] In doing so, I must review the Restrictions "as a whole[.]"[211]

The Homeowners argue that the Restrictions are unenforceable because they "vest absolute, discretionary authority in the [Association] and/or ARC to approve a property owners' building plans, landscaping plans, and grading plans subject to the ARC's 'opinion' as to 'aesthetic,' 'desirability,' 'suitability,' 'safety,' 'health,' and other standards."[212] This type of language has been questioned by this Court.[213] But the mere presence of these buzzwords in deed restrictions does not render them unenforceable. For example, Vice Chancellor Noble in *Lawhon v. Winding Ridge Homeowners Association, Inc.*, explained that although "restrictions based on abstract aesthetic desirability are impermissible[,] . . . our courts regularly enforce architectural review provisions designed to ensure the overall harmony of appearance within a community, when that community possesses a 'sufficiently

---

[210] *Wild Quail Golf & Country Club Homeowners' Ass'n, Inc. v. Babbitt*, 2021 WL 2324660, at *3 (Del. Ch. June 3, 2021).

[211] *Id.* (citations omitted).

[212] D.I. 61.

[213] *See, e.g.*, *Lawhon*, 2008 WL 5459246, at *5; *Dawejko v. Grunewald*, 1988 WL 140225, at *5 (Del. Ch. Dec. 27, 1988).

coherent visual style' enabling fair and even-handed application."[214]   Such represents the type of "built-in, objective standards that would enable [otherwise aesthetic restrictions] to be applied in an evenhanded manner or to be used as a guideline by lot owners in designing their residences."[215]

Here, the Restrictions have built-in, objective standards permitting evenhanded application.  Those standards are both procedural and substantive.  On the procedural side, the Restrictions provide, with specificity, what type of construction requires prior approval and how to seek such approval: by submitting "complete and comprehensive plans and specifications, prepared by a competent residential draftsman, showing the nature, kind, shape, height, materials, floor, elevation, foundation and footing plans, exterior color scheme, location and frontage of the lot, approximate cost of such building, structure, or other erection, and the grading and landscaping plan of the lot to be built upon or improved[.]"[216]

That procedure then informs the substantive side, where the ARC is charged with determining whether the plans are "suitable or desirable, in its or their sole opinion, for aesthetic, safety, health, police or other reasons," taking into account

---

[214] 2008 WL 5459246, at *5 (Del. Ch. Dec. 31, 2008).

[215] *Seabreak Homeowners Ass'n, Inc.*, 517 A.2d at 270.  *See also Welshire Civic Ass'n v. Stiles*, 1993 WL 488244, at *3 (Del. Ch. Nov. 19, 1993) (finding similar prior approval covenants "not so vague or arbitrary as to be wholly invalid as a matter of law").

[216] JX 1, Ex. D, Art. D.

39

"such factors which in its or their opinion would affect the desirability or suitability of such proposed improvements, erection, alteration, or change."[217]  The scope of review, which includes aesthetics among other reasons, relates back to the types of plans and specifications required.  It also works in tandem with the Materially Affects Provision, which provides "[t]he elevation of a lot will not be changed so as to materially affect the surface elevation or natural drainage of surrounding lots."[218] All these provisions must be read together.  Although doing so does not free the Restrictions from all subjectivity, it provides enough objectivity that the Restrictions are not unenforceable on their face.

### B. The Association did not arbitrarily enforce the Restrictions against the Homeowners.

Proving the Restrictions are enforceable is step one; the Association must also prove that they enforced the Restrictions against the Homeowners in a reasonable, and not arbitrary and capricious, manner.  I find the Association met this burden.

Although architectural review powers are commonplace, they are particularly susceptible to arbitrary, capricious, and unreasonable application.[219]  Accordingly,

---

[217] *Id.*

[218] The Parties dispute whether the Materially Affects Provision continues to bind the Community. D.I. 61, p. 34; D.I. 63, p. 12. I find it does. The March Restrictions provide how the restrictions may be modified. JX 75, Art. F.  The mere omission of the Materially Affects Provision from the November Restrictions is not enough.

[219] *Seabreak Homeowners Ass'n, Inc.*, 517 A.2d at 268.

40

these powers must be applied in a reasonable manner and "any doubts as to its reasonableness must be resolved in favor of the landowners."[220] The Association "must show [it] applied the relevant standards on a reasoned and nonarbitrary basis (not on subjective aesthetics)" to the Homeowners.[221] They did so here.

The Homeowners argue that the ARC, on behalf of the Association, acted arbitrarily and unreasonably in connection with the Homeowners' application in three (3) ways. First, the Homeowners argue that Mr. Harvey was biased against Mr. Beebe and used his *de facto* control over the ARC to impose heightened requirements on the Homeowners. Second, the Homeowners argue that the Restrictions are ambiguous as to what is required for a grading and drainage plan. And third, they argue that the turnover of the ARC calls into question their subjective decisions. I take these arguments in turn.

I agree with the Homeowners that the relationship between Mr. Beebe and Mr. Harvey was strained. There is no dispute that they struggled to work together and were often at odds during the application process and after the application was approved. But the Association has proven that Mr. Harvey's feelings for Mr. Beebe did not invade the ARC's process in a material way. First, the evidence does not support that Mr. Harvey exercised *de facto* control over the ARC. The record

---

[220] *Id.*

[221] *Wild Quail Golf & Country Club Homeowners' Ass'n, Inc.*, 2021 WL 2324660, at *5.

demonstrates that Mr. Harvey was only one voice on the Association's side expressing concerns about the Homeowners' plans. Second, despite any dislike, Mr. Harvey was the first member of the ARC to approve the Homeowners' plans. Even if I agree with the Homeowners that Mr. Harvey imposed additional requirements on them through his March 2021 communications, such requirements did not materially alter the process, rendering the ARC's entire review arbitrary and capricious. The Homeowners were able to respond to those "requirements" within thirty (30) minutes, and their application was approved shortly thereafter. On the record before me, I find any bias from Mr. Harvey toward Mr. Beebe did not infect the ARC's enforcement such that it was overall arbitrary and capricious.[222]

Moving to the second argument, I disagree that the Restrictions are ambiguous regarding what is required for a grading and drainage plan. The Restrictions provide in no uncertain terms that the Homeowners needed to submit a plan "prepared by a competent residential draftsman, showing the . . . grading and

---

[222] *See Lawhon*, 2008 WL 5459246, at *9 (finding enforcement was not arbitrary or capricious even though "the record suggests that [the president of the association] opposed the [homeowners'] home from his first encounter with [the homeowners' real estate agent]").

As highlighted by Vice Chancellor Glasscock, these homeowners' association disputes almost always involve a homeowner who "believes she has been singled out for unfair and overbearing—even tyrannical—treatment by the associations. At times that belief is vindicated; at other times, not." *Henlopen Landing Homeowners Ass'n, Inc. v. Vester*, 2019 WL 3484254, at *1 (Del. Ch. Aug. 1, 2019). This is one of the latter instances.

landscaping plan of the lot to be built upon or improved."[223] Mr. Harvey's February 2021 text message to Mrs. Beebe asking for "a plan including all calculations by a registered professional Delaware civil engineer showing the design of the storm water management plan" is a reasonable interpretation and enforcement of this requirement.[224]

Finally, the typical turnover in voluntary committee membership, like the ARC, does not render the decisions of the ARC as constituted at the time the Homeowners applied unreasonable or arbitrary. The Homeowners were provided with clear instructions as to the documentation they needed to submit for review and how and to whom those should be submitted. The instructions in the ARC Manual and from the ARC members tracked the Restrictions in all material respects. The ARC, as properly constituted, hewed closely to the procedural requirements in the Restrictions and, once the Homeowners submitted all the required documentation, the ARC promptly approved the Homeowners' plan.[225]

---

[223] JX 1, Ex. D, Art. D.

[224] JX 27.

[225] To the extent the Homeowners argue that the ARC was unreasonable in refusing to consider the belated submission of plans that depicted the Structure, I disagree. The Homeowners had adequate notice of the Restrictions and had been through the approval process before. They were also warned as early as November 15, 2021 that the Structure was not approved and invited to meet and discuss the Structure. JX 69. They chose not to heed those warnings or meet with the ARC and did not submit a plan seeking approval until January 26, 2022, after construction was complete. JX 58. It was not arbitrary or

## C.    The Homeowners violated the Restrictions.

Having found the Restrictions are enforceable and were reasonably applied to the Homeowners, I turn to whether the Homeowners violated the Restrictions. They did, in two ways. First, the Homeowners failed to submit a plan for approval before constructing the Structure. Second, the Homeowners failed to follow the Kercher Plan after receiving approval.

"Restrictive covenants implicate contractual rights, [and] . . . are construed in accordance with their plain meaning in favor of" the homeowners.[226] Here, the Restrictions expressly require prior approval for the construction of any "building, structure, fence, wall, dock, bulkhead, seawall, swimming pool or other erection[.]"[227] The Homeowners, despite being aware of these requirements, failed to submit any plans before constructing the Structure. Such violated the Restrictions.[228]

<hr>

unreasonable for the Association to defer such belated requests to their legal counsel and continue with these proceedings. JX 76.

[226] *Serv. Corp. of Westover Hills v. Guzzetta*, 2009 WL 5214876, at *3 (Del. Ch. Dec. 22, 2009) (citations and quotation marks omitted).

[227] JX 1, Ex. D, Art. D.

[228] The Homeowners argue that the Structure, as constructed, does not violate any term within the Restrictions. D.I. 61, p. 25. But it is not the material, color, or other attributes of the Structure that are at issue—the issue is that the Homeowners had adequate notice that construction of something like the Structure required prior approval and they failed to apply for that approval before construction. That failure is a breach, even if I agree with the Homeowners that the Structure could have been approved if an application was timely made. When an architectural review covenant is otherwise enforceable, the path of asking for forgiveness, rather than permission, leads homeowners to a dead end. *See Plantation*

Further, the only reasonable interpretation of the Restrictions is that homeowners must follow their plans after approval by the ARC; the Homeowners failed to follow the Kercher Plan and, as such, violated the Restrictions.[229]

*Park Ass'n, Inc. v. George*, 2007 WL 316391, at *3 (Del. Ch. Jan. 25, 2007) (explaining a relevant line "of cases can be readily reconciled as different methods of applying the maxim that equity will not reward inequitable conduct, such as the knowing violation of a covenant in a deed. Thus, those courts requiring a 'balancing' analysis in cases seeking to enjoin breach of a deed covenant tend to discount harm resulting for the knowing breach of the covenant"). *See also Quail Vill. Homeowners Ass'n, Inc. v. Rossell*, 2018 WL 6534456, at *4 (finding a homeowner's "argument – that the Association's witnesses, who serve on ARC, failed to express specific objections to the [unapproved] structure based upon the deed restrictions' standards – [wa]s premature, since [the homeowner] ha[d] not requested ARC's review of the structure and ARC ha[d] not responded to such a request. Further, any issues concerning the enforceability of the deed restrictions requiring ARC approval and their application by ARC, would become ripe only after that review has occurred."); *The Cove on Herring Creek Homeowners' Ass'n, Inc. v. Riggs*, 2003 WL 1903472, at *5, n.34 (Del. Ch. Apr. 9, 2003) (declining to "speculate upon what the ARC might have decided had the [homeowners] adhered to the approval process").

In *Point Farm Homeowner's Association, Inc. v. Evans*, Vice Chancellor Harnett noted "a homeowner may begin construction before obtaining approval where the approving authority unreasonably refuses to approve the homeowner's pans." 1993 WL 257404, at *4 (Del. Ch. June 28, 1993). I do not disagree. But the homeowner who moves forward without approval does so at her own risk. *See, e.g., Slaughter v. Rotan*, 1994 WL 514873, at *3 (Del. Ch. Sept. 14, 1994). Here, the Homeowners knowingly took that risk and, I find, it should not be condoned. The Homeowners also do not stand in the same shoes as the homeowners in *Point Farm*, who submitted extensive plans that were ultimately rejected for unenforceable reasons. *Point Farm*, 1993 WL 257404, at *4. Here, the Homeowners' plans were approved. But those plans did not include the Structure, for which the Homeowners did not seek prior approval and then, tried to hide the lack of approval through a misrepresentation to the ARC. *See* JX 19.

[229] The Homeowners argue that this argument is an unpled claim for breach of contract and should be denied. D.I. 61, p. 50. But "the legal force of the restrictive covenants that bind the [Community] is contractual in nature." *Seabreak Homeowners Ass'n, Inc.*, 517 A.2d at 269. *See also The Cove on Herring Creek Homeowners' Ass'n, Inc.*, 2003 WL 1903472, at *5, n.34 (finding that the homeowners' deviation from their application was a separate violation of the applicable restrictions). Further, the Association has been consistent in

45

Otherwise, the approval process would be for naught, as would the provision permitting entry upon the premises to see if construction is proceeding according to plan.[230] Here, the Homeowners did not take any steps to ensure the Kercher Plan was followed. They failed to provide the Kercher Plan to the person they hired to grade the property, Mr. Diaz, and, instead, gave him vague instructions to work on swales. Their disregard for their own plans, and their agreement to stick to those plans through the ARC's approval letter, is telling.

The Association has further proven that these insufficient instructions, as might be expected, failed to produce swales consistent with the Kercher Plan.[231] This discrepancy was demonstrated through (1) the testimony of Mr. Schlitter, who confirmed that the swales depicted in the Kercher Plan were not present when he was at the Property, and (2) the Ziegler Report, which concluded that the Property's front elevations were materially different than those contemplated by the Kercher

---

pursuing relief related to the Homeowners' failure to follow the Kercher Plan. *See, e.g.,* D.I. 1, D.I. 41.

[230] That approval letter also expressly required "[a]ny changes to the approved plans submitted will require ARC review & approval prior to any work beginning." JX 24. Mr. Beebe signed the approval, confirming that he would so comply. *Id.* But he did not.

[231] The Association also argues that the failure to follow the Kercher Plan led to elevation changes on the Property that "materially affect[ed] the surface elevation or natural drainage of surrounding lots" in violation of the Materially Affects Provision. *See* D.I. 59. I agree with the Homeowners that the Association failed to prove any such violation by a preponderance of the evidence. But the Association did prove that the Homeowners, more likely than not, failed to follow the Kercher Plan, resulting in materially different grading.

Plan. The Homeowners cannot rebut the neutral and credible observations of Mr. Schlitter. And I find their arguments against the Ziegler Report unpersuasive.[232]

With their involvement with the ARC and protracted application process, there is no reasonable basis for the Homeowners to believe that they could move forward without following approved plans. Rather, the record reflects that the Homeowners knowingly violated the Restrictions by failing to follow the Kercher Plan and constructing the Structure without prior approval.

### D. The Homeowners failed to prove their affirmative defenses of unclean hands and waiver.

Seeking to avoid judgment against them, the Homeowners assert two affirmative defenses, on which they bear the burden of proof: unclean hands and

---

[232] The Homeowners argue that the Ziegler Report is unreliable because it: (1) has an inaccurate elevation and street address, (2) fails to disclose which vertical datum, if any, was utilized, (3) fails to list a reference benchmark, (4) relies on unreliable data collected from an adjacent property and on an unlevel surface, and (5) was hastily done by a company connected to Mr. Harvey. I disagree that any of these arguments alone, or together, render the Ziegler Report unreliable. Any errors or inaccuracies were addressed by Mr. Ziegler's testimony and fail to undermine the ultimate conclusions reached. *See, e.g.*, Tr. 27:21-24. Further, the only hint regarding unreliable data was Mr. Beebe's self-serving testimony that the surveyors placed their tripod on rocks or stones; I find that testimony lacks credibility and is insufficient to undermine the thorough report and testimony from two qualified individuals. Tr. 70:23-71:17. And, finally, I see no indication that the quick turnaround of the Ziegler Report renders the otherwise well-reasoned and supported findings unreliable. Tr. 29:24-31:6. *Cf. Tumlinson v. Advanced Micro Devices, Inc.*, 81 A.3d 1264, 1272 (Del. 2013) (upholding a finding of unreliability where the expert failed to "adequately detail her methodology" in a scientifically sound manner).

47

waiver.[233]  I find these defenses should fail.

> ### i. The Homeowners failed to prove that the Association comes to this Court with unclean hands.

The Homeowners argue the Association engaged in nine (9) acts which demonstrate unclean hands: (1) the unannounced inspection that led to the Ziegler Report, (2) the filing of this litigation with the hope of a settlement, (3) Mr. Harvey's insults and threats to Mr. Beebe and failure to recuse himself from the ARC process, (4) Mr. Harvey's imposition of extra burdens on the Homeowners, (5) the Association's failure to consult with the Homeowners' other neighbor before filing this action, (6) Mr. Harvey and Mr. Blancke's alleged abuse of authority in not involving all of the ARC members in the various decisions and communications, (7) the Association's institution of this action without a fully signed consent or full director or member meeting, (8) Mr. Harvey's exercise of unilateral authority over the Homeowners' application, and (9) the Association's unwillingness to meet with the Homeowners in January 2022.  I disagree that these support a finding of unclean hands.

---

[233] Although the Homeowners pled an affirmative defense of laches, they withdrew the defense in post-trial briefing. D.I. 12; D.I. 61, p. 53, n.263.

"Unclean hands derives from the equitable maxim that [sh]e who comes into equity must come with clean hands."[234] It is a rule of public policy applied "to protect the public and the court against misuse by one who, because of [her] conduct, has forfeited [her] right to have the court consider [her] claims, regardless of their merit."[235] Although there is no strict formula, the primary question "raised by a plea of unclean hands is whether the plaintiff's conduct is so offensive to the integrity of the court that [her] claims should be denied, regardless of their merit."[236] A secondary question is whether the offensive conduct is connected to the claims at issue. "[F]or the unclean hands doctrine to apply, 'the inequitable conduct must have an immediate and necessary relation to the claims under which relief is sought.'"[237]

The Homeowners have failed to meet this heavy burden. There is no dispute that tempers flared between Mr. Harvey and Mr. Beebe. Mr. Harvey also used harsh language and tried to "teach" Mr. Beebe, in a way that could be interpreted as condescending. Could, and should, Mr. Harvey have behaved better? Perhaps. But

---

[234] *Murray v. Rolquin*, 2023 WL 2421687, at *13 (Del. Ch. Mar. 9, 2023) (citation and quotation marks omitted).

[235] *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976).

[236] *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. Aug. 16, 1991) *aff'd sub nom. New Castle Ins., Ltd. v. Gallagher*, 692 A.2d 414 (Del. 1997).

[237] *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 237–38 (Del. Ch. 2014) (quoting *Nakahara v. NS 1991 Am. Trust*, 718 A.2d 518, 523 (Del. Ch. 1998)).

Mr. Harvey's human errors do not leave the Association with unclean hands to pursue this action. Nor was the Association's decision to pursue its claims before this Court improper. The ARC attempted to meet with the Homeowners and resolve their disputes without the need for litigation. Rather than meet with the ARC, the Homeowners started a campaign against the ARC, consulting with and soliciting support from other members of the Association. The Association's decision to move forward with litigation is understandable. As is the Association's ongoing hope that this litigation could be resolved; this Court encourages settlement and there is nothing improper about the Association filing this action, while remaining open to reaching a mutually agreeable resolution. Finally, the unannounced inspection that led to the Ziegler Report, which did not intrude on the Property and was conducted from an adjacent parcel, is not alone nor coupled with the above conduct so offensive to the integrity of the Court that the Association's claims should be barred.[238]

### ii. The Homeowners failed to prove that the Association waived its ability to enforce the Restrictions against the Homeowners.

The Homeowners also argue that the Association has waived its ability to enforce the Restrictions. The Parties, through post-trial briefing, quibble over the

---

[238] None of the items on the Homeowners' list of alleged bad acts support a finding of unclean hands either alone or taken together. The Homeowners' unclean hands argument rings especially hollow considering their inequitable conduct of disregarding the Kercher Plan after the ARC approved it and installing the Structure without seeking prior approval. *See Quail Vill. Homeowners Ass'n, Inc.*, 2018 WL 6534456, at *3.

appropriate standard for waiver versus the related, unpled defense of abandonment.

> The terms abandonment and waiver are sometimes used interchangeably and the conduct that leads to a finding of abandonment may frequently support a claim of waiver. Abandonment, which is difficult to establish, occurs when all beneficiaries have relinquished their rights to enforce a particular covenant or a general plan of covenants. Waiver usually involves a failure to object to other violations of the same or similar servitudes such that it would be unfair to allow the claimant to enforce the servitude against the current violation. Thus, the principal difference between the two defenses is that waiver usually involves failure to object to a particular violation of a servitude under circumstances that lead to the conclusion that the beneficiary is precluded from objecting to different but similar violations. Moreover, extensive waiver can ultimately amount to abandonment of the servitude.[239]

But "[o]ne modest partial exception" permitted by an association "is not sufficient to show that a deed restriction has been so indolently or erratically enforced as to render future enforcement arbitrary."[240]

The Homeowners argue that there are numerous structures in the Community like the Structure, one of which the Association has not demonstrated was approved before construction. Because the Association has either approved or failed to challenge unapproved structures like the Structure, the Homeowners argue the Association has waived the ability to challenge the Structure here. I disagree.

---

[239] *Tusi v. Mruz*, 2002 WL 31499312, at *3 (Del. Ch. Oct. 31, 2002) (cleaned up).

[240] *Dolan v. Vills. of Clearwater Homeowner's Ass'n, Inc.*, 2005 WL 2810724, at *4 (Del. Ch. Oct. 21, 2005).

To prove waiver, the Homeowners needed to present evidence making it more likely than not that the Association has not required other homeowners to seek prior approval of structures like the Structure.[241] One instance where prior approval is uncertain is not sufficient to meet this burden.[242] It is particularly unpersuasive when viewed next to an instance where the similar structure was submitted for review and approval. Further, to the extent the Homeowners are arguing that the Association's (or the ARC's) prior approval for one homeowner means it waives the ability to require prior approval from other homeowners for like projects, that proposition is rejected. Prior approval covenants do not lose their force and effect when approval is granted; rather than represent waiver, such represents an enforced process. Here, the Association, through the ARC, consistently enforced the prior approval process.

### E. The Association is entitled to injunctive relief.

Having found the Association should prevail, and the Homeowners' defenses should fail, I turn to the appropriate relief. The Association seeks a permanent injunction requiring the Homeowners to remove the Structure and regrade the Property per the Kercher Plan. I find this relief should be granted.

---

[241] The question is not whether the Structure, if submitted for approval, would or should be approved. Because a plan for the Structure was not submitted for prior approval, that issue is not before me and would be premature to address. *Quail Vill. Homeowners Ass'n, Inc.*, 2018 WL 6534456, at *4.

[242] *See Dolan*, 2005 WL 2810724, at *4 (finding one instance insufficient to show arbitrary enforcement, explaining "the solitary anecdote actually tends to reinforce the importance of" the restrictions).

To receive injunctive relief, the Association must prove: "(1) actual success on the merits of the claims; (2) that the [Association] will suffer irreparable harm if injunctive relief is not granted; and (3) that the harm to the [Association] outweighs the harm to the [Homeowners if] an injunction is granted."[243]  Prong one (1) has already been addressed; thus, I focus on irreparable harm and balancing of the harms.

The irreparable harm analysis is unique in the deed restriction context.  As explained by then-Vice Chancellor Steele:

> The [homeowners within a community with deed restrictions] knowingly enter into a social contract with the other lot owners when purchasing their land. This contract includes adhering to the Restrictions' restrictive covenants. Relying on the covenant, many lot owners have invested a large amount of time and money improving their lots, including building residences for themselves. Once a restriction is breached, the [homeowners association] can never again regain the sanctity of the covenant.[244]

Although injunctive relief may be an extreme remedy at times, it is appropriate when there would not be "substantial economic harm" to the noncompliant homeowners.[245]  That is because "[e]quity will not reward a knowing breach of restrictions."[246]

---

[243] *O'Marrow*, 2015 WL 5714847, at *11.

[244] *Slaughter*, 1994 WL 514873, at *3.

[245] *The Cove on Herring Creek Homeowners' Ass'n, Inc.*, 2003 WL 1903472, at *6.

[246] *Quail Vill. Homeowners Ass'n, Inc.*, 2018 WL 6534456, at *3; *Plantation Park Ass'n, Inc.*, 2007 WL 316391, at *5 (explaining this Court may "discount harm resulting for the knowing breach of the covenant" in its balancing analysis).

I find Vice Chancellor Noble's decision in *The Cove on Herring Creek Homeowners' Association, Inc. v. Riggs* on point.[247]  Therein, Vice Chancellor Noble ordered injunctive relief, mandating the removal of unapproved sheds.[248]  The homeowners had "placed their sheds despite the absence of approval from the ARC and after th[e] action had been filed."[249]  Thus, "they [we]re not innocent victims of circumstance."[250]  Because the homeowners also failed to make any showing of "substantial economic harm if they are required to remove their sheds[,]" Vice Chancellor Noble granted injunctive relief.[251]

I recommend the same here.  The Homeowners violated the Restrictions when they failed to follow the Kercher Plan and installed the Structure without prior approval.  These were not innocent or mistaken actions; they were knowing violations.  The harm to the Association is evident from the breached social contract.  The Homeowners, on the other hand, failed to show any substantial economic harm from the injunctive relief requested and failed to quantify the cost of remediation.  Further, the cost is of the Homeowners' own making.  Despite their knowledge of

---

[247] 2003 WL 1903472, at *6.

[248] *Id.*

[249] *Id.*

[250] *Id. See also Slaughter*, 1994 WL 514873, at *3 (balancing the harms against the homeowners where they "voluntarily elected to run the risk of placing themselves in a worse position by choosing to interpret the restriction to suit themselves").

[251] *The Cove on Herring Creek Homeowners' Ass'n, Inc.*, 2003 WL 1903472, at *6.

the Restrictions and extensive involvement in the application process with the ARC, the Homeowners chose not to follow the Kercher Plan and to construct the Structure without seeking approval. That conscious decision should have consequences.[252] This Court should issue an injunction requiring the Homeowners to remove the Structure and regrade the Property consistent with the Kercher Plan.[253]

**F.      Fees and costs should be shifted in the Association's favor.**

Under 10 *Del. C.* § 348(e), "[t]he nonprevailing party at a trial held pursuant to the provisions of this section must pay the prevailing party's attorney fees and court costs, unless the court finds that enforcing this subsection would result in an unfair, unreasonable, or harsh outcome."

---

[252] The Homeowners' knowing conduct distinguishes this case from *Quail Village Homeowners Association, Inc. v. Rossell*, where there was no evidence that the homeowner "knowingly proceeded with construction at her own risk[,]" and Master Griffin, in reliance thereon, approved injunctive relief short of removal (requiring the homeowner to submit a plan for approval). 2018 WL 6534456, at *4. *Cf. Tusi v. Mruz*, 2002 WL 31499312, at *5 (acknowledging the "draconian nature of relief requiring demolition of [a] [g]arage" and, nonetheless, ordering same); *Christine Manor Civic Ass'n v. Gullo*, 2007 WL 3301024, at * 4 (Del. Ch. Nov. 2, 2007) (finding "[t]he only equitable and viable remedy available to the Court" where the homeowner built a structure without approval and "at her risk" was "removal of the structure").

[253] I note, like Vice Chancellor Noble did in *The Cove on Herring Creek Homeowners' Association, Inc. v. Riggs*, that it is at least conceivable that the Structure could be approved through the appropriate process. 2003 WL 1903472, at *6, n.37. But I, nonetheless, recommend removal to ensure that the Homeowners can fully implement the Kercher Plan. If there is a way to work the Structure into the Kercher Plan (which there appears to be per the January 31, 2022 letter from the Kercher Group), that can be explored through an application to the ARC. JX 22.

The Association is the prevailing party. Thus, fees and costs should be shifted in the Association's favor, unless the Homeowners can demonstrate that enforcing statutory fee shifting would be unfair, unreasonable, or harsh. The Association should be compelled to file an affidavit under Court of Chancery Rule 88 within twenty (20) days of this report becoming a final order of the Court; the Homeowners should then be permitted to respond within twenty (20) days of filing.

## III. CONCLUSION

For the foregoing reasons, I find the Homeowners violated the Restrictions and the Association is entitled to injunctive relief. The Homeowners should be required to remove the Structure and to regrade the Property in compliance with the Kercher Plan. The Association is also entitled to shifting of fees and costs under 10 *Del. C.* § 348(e).

This is my final report and exceptions may be filed under Court of Chancery Rule 144.